RECORD NUMBER: 13-4434

# United States Court of Appeals

### *for the*

# Fourth Circuit

**UNITED STATES OF AMERICA,**

*Appellee,*

– v. –

**STEPHEN MICHAEL HOPKINS,**

*Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON**

# OPENING BRIEF OF APPELLANT

**A. COURTENAY CRAIG**
**CRAIG LAW OFFICE**
**621 6th Avenue**
**Huntington, WV 25701**
**(304) 697-4422**

*Counsel for Appellant*

**CP** **COUNSEL PRESS • VA – (800) 275-0668**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................... iii

STATEMEMENT OF JURISDICTION ...................................... 1

STATEMENT OF ISSUES .......................................................... 2

STATEMENT OF THE CASE ....................................................... 2

STATEMENT OF THE FACTS ....................................................... 3

SUMMARY OF ARGUMENTS ...................................................... 9

ARGUMENT ................................................................................ 10

I.     WHETHER OFFICERS HAD REASONABLE SUSPICION
       TO BELIEVE MR. HOPKINS AND MORGAN WERE
       ENGAGED IN CRIMINAL CONDUCT WHEN THE
       OFFICER APPROACHED THEM, QUESTIONED THEM,
       ORDERED THEM FROM THE CAR AND FORCIBLY
       ATTEMPTED TO SEIZE THEM BY TURNING OFF THE
       VEHICLE AND, IF NOT, WHETHER THE SUBSEQUENT
       SEARCH WAS FRIUT OF THE POISONOUS TREE
       DIRECTLY ATTRIBUTABLE TO THE INITIAL ILLEGAL
       STOP ........................................................................ 10

           STANDARD OF REVIEW ...................................... 10

           DISCUSSION ........................................................ 10

II.    THE SEARCH OF THE CAR DRIVEN BY MR. HOPKIN
       WAS AN INVESTIGATORY SEARCH, NOT AN
       ADMINISTRATIVE SEARCH, AND EVEN IF IT WERE AN
       ADMINISTRATIVE SEARCH, THE CHARLESTON
       POLICE DEPARTMENT POLICY IS
       UNCONSTITUTIONAL UNDER STATE LAW AND
       THERE WAS NEITHER PROBABLE CAUSE NOR
       EXIGENT CIRCUMSTANCES TO JUSTIFY A
       WARRANTLESS SEARCH ........................................ 21

i

STANDARD OF REVIEW ...................................................... 21

DISCUSSION ....................................................................... 21

CONCLUSION AND RELIEF SOUGHT .................................................. 25

REQUEST FOR ORAL ARGUMENT ...................................................... 26

CERIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## U.S. CASES

Arizona v. Gant,
 556 U.S. 332 (2009)..........................................................................25

Bad Elk v. United States,
 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900) .............................19

Illinois v. Wardlow,
 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) .....................13

Michigan v. Chesternut,
 486 U.S. 567 (1988)..........................................................................19

Nardone v. United States,
 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939) .............................20

South Dakota v. Opperman,
 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) .....................22

Terry v. Ohio,
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ....................*passim*

United States v. Arvizu,
 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) .......... 13, 14, 15

United States v. Cortez,
 449 U.S. 411 (1981).......................................................... 10, 11, 14, 15

Whren v. United States,
 116 S.Ct. 1769 (1996).......................................................................11

## FOURTH CIRCUIT CASES

United States. v. Branch,
 537 F.3d 328 (4th Cir. 2008) ............................................................14

United States v. Lender,
 985 F.2d 151 (4th Cir.1993) ............................................................. 10

United States v. McCoy,
 513 F.3d 405 (4th Cir.2008) ........................................................ 13, 15

United States v. Perkins,
 363 F.3d 317 (4th Cir.2004) ........................................................ 15, 17

United States v. Rusher,
 966 F.2d 868 (4th Cir.1992) ........................................................ 10, 21

United States v. Sowards,
 690 F.3d 583 (4th Cir. 2012) ............................................................ 20

United States v. Sprinkle,
 106 F.3d 613 (4th Cir.1997) ........................................................ 13, 14

## **OTHER CIRCUITS**

United States v. Caicedo,
 85 F.3d 1184 (6th Cir. 1996) ............................................................ 16

United States v. Edwards,
 632 F.3d 633 (10th Cir. 2001) .......................................................... 21

United States v. Haro–Salcedo,
 107 F.3d 769 (10th Cir.1997) .......................................................... 22

United States v. Hughes,
 517 F.3d 1013 (8th Cir. 2008) .......................................................... 12

United States v. Johnson,
 383 F.3d 538 (7th Cir. 2004) ............................................................ 11

United States v. Lugo,
 978 F.2d 631 (10th Cir. 1992) .......................................................... 25

United States v. Packer,
 15 F.3d 654 (7th Cir. 1994) ............................................................. 12

iv

United States v. Perkins,
    348 F.3d 965 (11th Cir. 2003) ...................................................... 15, 17

United States v. Proctor,
    489 F.3d 1348 (D.C. 2007)........................................................... 23

United States v. Salzano,
    149 F.3d 1238 (10th Cir. 1998) .......................................... 16

United States v. Spinner,
    475 F.3d 356 (D.C. Cir. 2007)........................................... 18

## **WEST VIRGINIA CASES**

State v. Goff,
    166 W.Va. 47, 272 S.E.2d (1980) ...................................... 23

State v. York,
    203 W.Va. 103, 506 S.E.2d 358 (1998) ........................................ 9, 24

## **RULES AND STATUTES**

18 U.S.C. § 3231 ..................................................................... 1

18 U.S.C. § 3742................................................................... 1

21 U.S.C. §  801 ..................................................................... 3

21 U.S.C. § 841(a) ................................................................ 2

21 U.S.C. § 853(a) ................................................................ 2

28 U.S.C. § 1291 ................................................................... 1

Fed. R. App. P. 4(b) ............................................................... 1

Fed. R. Crim. P. 32.2.............................................................. 2

## <u>SUBJECT MATTER AND APPELLATE JURISDICTION</u>

The district court had jurisdiction of the matter on appeal under 18 USC § 3231 because the appellant was charged with offenses against the laws of the United States of America. (JA-17/CM/ECF Entry No. 8, Superseding Indictment)

The Court of Appeals has jurisdiction of the appeal under 18 USC § 3742 and 28 USC § 1291 as this an appeal from a final judgment of conviction and sentence rendered in the United States District Court for the Southern District of West Virginia at Charleston.

Sentencing occurred on May 22, 2013. Judgment was entered on June 3, 2013. (JA-287/ CM/ECF Entry No. 179, Judgment Order) A notice of appeal was filed on May 31, 2013, in accordance with Fed.R.App.P. 4(b). (JA-286/ CM/ECF Entry No. 177, Notice of Appeal) This appeal is from a final judgment that disposes of all the defendant's preserved claims.

1

## STATEMENT OF THE ISSUES

I.   **WHETHER OFFICERS HAD REASONABLE SUSPICION TO BELIEVE THAT MR. HOPKINS AND MR. MORGAN WERE ENGAGED IN CRIMINAL CONDUCT WHEN THE OFFICER APPROACHED THEM, QUESTIONED THEM, ORDERED THEM FROM THE CAR AND FORCIBLY ATTEMPTED TO SEIZE THEM BY TURNING OFF THE VEHICLE AND, IF NOT, WHETHER THE SUBSEQUENT SEARCH WAS FRUIT OF THE POISONOUS TREE DIRECTLY ATTRIBUTABLE TO THE INITIAL ILLEGAL STOP AND AN IMPROPER INVENTORY SEARCH.**

II.  **THE SEARCH OF THE RENTAL CAR DRIVEN BY MR. HOPKINS WAS AN INVESTIGATORY SEARCH, NOT AN ADMINISTRATIVE SEARCH, AND EVEN IF IT WERE AN ADMINISTRATIVE SEARCH, THE CHARLESTON POLICE DEPARTMENT POLICY IS UNCONSTITUTIONAL AND THERE WAS NEITHER PROBABLE CAUSE NOR EXIGENT CIRCUMSTANCES TO JUSTIFY A WARRANTLESS SEARCH**

## STATEMENT OF THE CASE

This is an appeal from a judgment entered in the United States District Court for the Southern District of West Virginia in Charleston, on June 3, 2013, under case number 2:11-cr-178. Mr. Hopkins was originally charged by indictment on August 2, 2011 (JA-16/CM/ECF Entry No. 1, Original Indictment). A superseding indictment was filed on November 29, 2011, (JA-17/ CM/ECF Entry No. 8, Superseding Indictment), which charged the following: Count 1, Possession with Intent/Aiding and Abetting, 21 U.S.C. 841(a) and 18 U.S.C. 2 and; Count 2- Forfeiture of $11,602, 21 U.S.C. 853(a), Rule 32.2 of the Federal Rules of Criminal Procedure, and 21 U.S.C.

2

801 et seq. The forfeiture claim was later dismissed. (JA-5, CMECF Entry 67)

On December 3, 2012, a Hearing on a Motion to Suppress was held concerning the reasonable suspicion for the initial stop and the items ultimately recovered from the vehicle Mr. Hopkins was driving. The district court ruled there was reasonable suspicion to support the eventual stop and then ruled the Defendants had no privacy interest in the articles left in the vehicle they were driving and voluntarily abandoned the items in the vehicle. (JA -178/CM/ECF Entry No. 116, Order on Motion to Suppress) Mr. Hopkins eventually pled guilty on January 30, 2013. (JA-215/ CM/ECF Entry No. 143, Plea Agreement)

Mr. Hopkins was sentenced on May 22, 2013 to 151 months on Count 1 (JA-287/CM/ECF Entry No. 179, Judgment Order)   He filed a notice of intent to appeal on May 31, 2013 (JA-287/CMF Entry No. 177, Notice of Appeal)

## STATEMENT OF THE FACTS

On March 16, 2011, Charleston Police Department Officers were called to a possible burglary call at 2603 Sixth Avenue in Charleston, WV. (JA-80/ Suppression Hearing Testimony)   Officers were not given a description of a suspect or any suspected vehicle involved in the alleged burglary. (JA-94 /Suppression Hearing Testimony)

3

Officer Daniel Goffreda was the first officer to respond, other officers responding were his back-up. (JA-92/Suppression Hearing Testimony) On arrival, Officer Goffreda overshot 2603 Sixth Avenue and passed it. (JA-90/Suppression Hearing Transcript) Upon realizing he had gone too far, Officer Goffreda stopped his car and exited the vehicle. (JA-91, 95/Suppression Hearing Testimony) While approaching 2603 Sixth Avenue on foot, Officer Goffreda testified he saw a Silver Dodge Charger parked adjacent to the lot containing 2603 Sixth Avenue. (JA 178-199/Suppression Order) He initially noticed the engine running. (JA-80, 91, 95 /Suppression Hearing Testimony) Officer Goffreda originally testified the car was parked right in front of the residence but Officer Whittington later admitted the car was parked next to the side yard. (JA-95, 143/Suppression Hearing Testimony)

Officer Goffreda and Officer Whittington admit the men in the car were doing nothing illegal and nothing suspicious when approached. (JA-95,134/ Suppression Hearing Testimony) They noted Mr. Hopkins was driving and Mr. Morgan was sitting in the back seat. (JA-86, 116/ Suppression Hearing Testimony) Officer Goffreda also stated he thought someone else might be around because of the men's seating arrangement in the car but gave no explanation for that feeling other than it seemed odd. (JA 100-101/Suppression Hearing Testimony)

4

According to Officer Goffreda, he engaged Mr. Hopkins in a "casual conversation" to ascertain their situation. (JA 81-82/Suppression Hearing) The officer did not speak to Mr. Morgan at all. (JA-98/Suppression Transcript) When the officer asked Mr. Hopkins what he was doing there at the time, he claims Mr. Hopkins stated he was "girl watching." (JA-96/Suppression Hearing Testimony) Mr. Hopkins testified at the suppression hearing he told Officer Goffreda "we waiting on some girls." (JA-168/Suppression Hearing Testimony)

The officer asked Mr. Hopkins for identification. (JA-40 /Suppression Hearing Testimony) Mr. Hopkins complied giving him an Ohio non-driver's license identification card. (JA-40, Suppression Hearing Testimony)

In the Court's Order denying the Motion to Suppress, the Court only cites the officer's answers to the Court's protracted questioning after cross-examination, not his answers to cross-examination, and suggests its own thoughts on Mr. Hopkins providing the non-driver's card instead of the officer's testimony on the subject. Officer Goffreda never testified it is customary for a driver to provide a license when asked for identification. The Order states the Officer's request for identification "may have phrased it as license" (JA-180, Memorandum Opinion Order) and "it seems customary that the driver of a vehicle would provide his operator's license to a law enforcement officer when asked for identification" (JA-193, Memorandum Opinion).

5

The actual testimony of Officer Goffreda when cross-examined if he asked Mr. Hopkins for a driver's license was "I had not got to that point" (JA-98-99, Suppression Hearing Testimony), "I had not got to that point yet, no sir" (JA-99, Suppression Hearing Testimony). "I had not run it yet if that's what you are asking sir" (JA-100, Suppression Hearing Testimony) and, finally, "no sir" in response when directly questioned whether he asked for a driver's license." (JA-100, Suppression Hearing Testimony)

The identification card was not suspicious and gave the officer no reason for concern (JA 56-57/Suppression Hearing Testimony), however, the Officer held on to the ID, possibly to run the identification number as suggested. (JA-41/Suppression Hearing Testimony) He also asked Mr. Hopkins to turn off the vehicle, which Hopkins did. (JA-41/Suppression Hearing Testimony) Officer Goffreda then asked both individuals to step out of the car. (JA-42/Suppression Hearing Testimony) Mr. Hopkins testified he was told to step out of the car and place his hands behind his back. (JA-169/ Suppression Hearing Testimony) Mr. Hopkins also testified he asked the Officer was he under arrest and the officer stated "no." (JA-169/Suppression Hearing Testimony) Mr. Hopkins testified he then stated "Well, I have no reason for that." (JA-169 /Suppression Hearing Testimony)

Other officers from responding units arrived as this conversation was taking place. (JA-83/Suppression Hearing Testimony) Officer Whittington testified he approached the vehicle and heard Officer Goffreda order Mr. Hopkins and Mr. Morgan from the vehicle. (JA 115-116/Suppression Hearing Testimony)

Officer Whittington never testified he noticed anything unusual during the encounter except Mr. Hopkins turning the car back on after being asked to exit the vehicle. In fact, he had only been there 45 seconds when he tried to reach through the window and disable the car. (JA-133, Suppression Hearing Testimony) Officer Goffreda testified Mr. Hopkins, immediately prior to Officer Whittington's attempt, made an unintelligible statement, started the car and drove off. (JA-83/Suppression Hearing Testimony) Officer Whittington testified when he noticed Mr. Hopkins starting the car, he reached in the driver's window and attempted to turn the vehicle off but he was unsuccessful. (JA-116/Suppression Hearing Testimony) Officer Whittington also testified he had not seen Mr. Hopkins do anything illegal (JA-134, Suppression Hearing Testimony) and Officer Goffreda testified Mr. Hopkins had done nothing illegal and was free to leave (JA 99-100 /Suppression Hearing Testimony), yet an alleged high speed pursuit took place when Officers decided to chase Mr. Hopkins, ostensibly because he left his identification, or because may have not had a driver's license. (JA-99/Suppression Hearing Testimony)

7

Mr. Hopkins drove one block, turned right off Sixth Avenue toward Seventh Avenue, one block and made a right onto Seventh Avenue and then drove nine blocks to the intersection of Iowa Street and Seventh Avenue where he allegedly lost control of the car and crashed. (JA-94, 163/Suppression Hearing Testimony)  Officer Goffreda testified he estimated Mr. Hopkins speed to be between 60-70 miles an hour (JA 158-159/Suppression Hearing Transcript) where the posted speed limit is 40 mile per hour. (JA-159/Suppression Hearing Testimony) Officer Goffreda testified when he turned onto Seventh Avenue Mr. Hopkins car was several blocks ahead of him (JA 162/Suppression Hearing Transcript), at least five blocks, (JA-165/Suppression Hearing Testimony) and he estimated the speed by looking at his odometer and guessing what Mr. Hopkins speed was. (JA-158/Suppression Hearing Testimony) Again, the entire distance between 2603 Sixth Avenue and the intersection of Seventh Avenue and Iowa Street is nine blocks or .8 of a mile according to Map Quest. (JA-163/Suppression Hearing Testimony). The officer further admitted he had no specialized training in gauging people's speed at distance. (JA-166/Suppression Hearing Testimony)

Upon arriving at the crash scene, the officers saw Mr. Hopkins and Mr. Morgan running from the scene. (JA-43/Suppression Hearing Testimony) Officers quickly apprehended both men and returned them to the crash site. (JA-153-154 /Suppression

8

Hearing Testimony) While other officers were at the scene, the 911 CAD sheet denotes Officer Kapelchuck noticed a gun holster on the seat and stated he was going to search the vehicle. (JA-41/Suppression Hearing Transcript) The gun holster was never listed on any property inventory. (JA-154/Suppression Hearing Testimony) Officer Kapelchuck testified at trial he was conducting an inventory search of the car but he followed none of the required procedure for an inventory search under State law. (JA-153-154/Suppression Hearing Testimony, Charleston PD Inventory Policy, State v. York) Inside the car, the officer located an undetermined amount of marijuana, heroin and approximately $10,900 in United States currency. (JA-147/Suppression Hearing Testimony)

## SUMMARY OF ARGUMENTS

1.    Officers had no reasonable suspicion to believe Mr. Hopkins and Mr. Morgan were engaged in criminal conduct when the officer approached the car, questioned them, ordered them from the car and forcibly attempted to seize them by turning off the vehicle, as such, the subsequent search of the vehicle was fruit of the poisonous tree directly attributable to the improper escalation of the initial encounter causing Mr. Hopkins to avoid an illegal seizure.

2.    The search of the car driven by Mr. Hopkins was an investigatory search, not an administrative search, and even if it were an administrative search, the Charleston

9

Police Department Inventory Policy is unconstitutional and there was neither probable

cause nor exigent circumstances to justify a warrantless search.

## ARGUMENT

**I. WHETHER OFFICERS HAD REASONABLE SUSPICION TO BELIEVE THAT MR. HOPKINS AND MR. MORGAN WERE ENGAGED IN CRIMINAL CONDUCT WHEN THE OFFICER APPROACHED THEM, QUESTIONED THEM, ORDERED THEM FROM THE CAR AND FORCIBLY ATTEMPTED TO SEIZE THEM BY TURNING OFF THE VEHICLE AND, IF NOT, WHETHER THE SUBSEQUENT SEARCH WAS FRUIT OF THE POISONOUS TREE DIRECTLY ATTRIBUTABLE TO THE INITIAL ILLEGAL STOP AND AN IMPROPER INVENTORY SEARCH.**

## STANDARD OF REVIEW

"We review legal conclusions involved in the district court's suppression

determination de novo but review factual findings underlying the legal conclusions

subject to the clearly erroneous standard." United States v. Rusher, 966 F.2d 868,

873 (4th Cir.1992).

## DISCUSSION

Officers had no reasonable suspicion for the Terry stop of the vehicle after the

police-citizen encounter escalated by Officer Whittington reaching in the car to

illegally seize Mr. Hopkins' by stopping the vehicle. "Reasonable suspicion" is

required to justify an investigatory stop of an automobile. See United States v. Cortez,

449 U.S. 411, 417-18 (1981); United States v. Lender, 985 F.2d 151, 154-55 (4th

10

Cir.1993); cf. <u>Whren v. United States</u>, 116 S.Ct. 1769, 1772 (1996) (noting that an automobile stop is "subject to the constitutional imperative that it not be 'unreasonable' under the circumstances"). This standard is an "elusive concept," <u>Cortez</u>, 449 U.S. at 417, and requires "that the totality of the circumstances--the whole picture--must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>Id</u>. Reaching into a car, while the motor is engaged, in an attempt to disable it, is unreasonable when no reasonable suspicion or probable cause exists to detain an individual or the vehicle itself.

In this instance, officers were notified of a possible burglary at 2603 6th Avenue. (JA-90/Suppression Hearing Testimony) Officers were neither given a description of possible suspects nor notified a vehicle may be involved. (JA-94/Suppression Hearing Testimony) See <u>United States v. Johnson</u>, 383 F.3d 538 (7th Cir. 2004) (Officers lacked reasonable suspicion for Terry stop given the lack of a connection between the automobile and reported suspicious activity). The only thing officers knew for sure was the address of the home possibly being burglarized.

When officers arrived at the scene they had no additional information regarding the alleged burglary other than an alleged attempted entry of the home. (JA-94/Suppression Hearing Testimony) All Officer Goffreda saw when he arrived was

11

two men seated in a car (JA-95/Suppression Hearing Testimony ) which is not unusual conduct. (See United States v. Hughes, 517 F.3d 1013 (8th Cir. 2008) (absent corroboration, the anonymous call to police that there were suspicious parties outside the apartment complex was not sufficient to establish a reasonable belief that the defendant whom the officer found across the street from the alleged trespass, had committed a crime.) See also United States v. Packer, 15 F.3d 654 (7th Cir. 1994) (an anonymous tip at 1:00 a.m. reporting suspicious vehicle with four African-American men sitting inside with fogged windows did not give rise to reasonable suspicion even though the car had been parked there for more than an hour.)

The police witnessed no suspicious behavior on the part of the defendants to lead them to reasonably conclude criminal activity was afoot. (JA-103, 133/ Suppression Hearing Testimony) A brief investigatory stop may occur "[w]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Officers never testified their experience led them to believe anything. All the officers could have had was a hunch because Mr. Hopkins did nothing suspicious or criminal in either officer's presence. An "inchoate and unparticularized suspicion or 'hunch' " is not a permissible basis for a Terry stop and is not a legal reason to escalate a police-citizen encounter to a Terry stop. Id. at

12

27, 88 S.Ct. 1868; <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

All Officer Goffreda reported was the car was parked adjacent to the home with a driver and a person seated behind him. "Though the facts need not give rise to probable cause, the officer must be able to articulate an objectively reasonable suspicion of criminal activity." See, e.g., <u>United States v. Arvizu</u>, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); <u>United States v. McCoy</u>, 513 F.3d 405, 411 (4th Cir.2008); <u>United States v. Sprinkle</u>, 106 F.3d 613, 617 (4th Cir.1997). By his own report, the officer saw nothing suspicious from the men in the car, yet, he still chose to approach the vehicle instead of the home where the possible burglary was occurring.

The officer stated the vehicle was parked directly in front of 2603 6th Avenue but failed to mention the yard is extended and runs a good portion of the block. (JA-97, 143-144/Suppression Hearing Transcript) Furthermore, one person seated in the back seat does not give rise to reasonable suspicion of criminal activity. The officer testified it gave rise to believe in the presence of other persons but his testimony does not suggest he asked about other persons. (JA 80-83/Suppression Hearing Testimony) "In order to extend a traffic stop beyond this scope, a police officer must either obtain the driver's consent or possess some articulable evidence to support a reasonable

13

suspicion that illegal activity is afoot. <u>U.S. v. Branch</u>, 537 F.3d 328 (4th Cir. 2008). No reasonable suspicion ever existed to extend the initial encounter.

Reasonable suspicion is an objective standard, measured by the facts known by the law enforcement officer(s) involved. Reasonable suspicion does not turn on the subjective beliefs of the officer to determine whether he thought that the facts constituted reasonable suspicion." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citing United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998)). Reasonable suspicion requires more than an officer's "inchoate and unparticularized suspicion" or "hunch that criminal activity is afoot." In the context of a routine traffic stop, the "articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." <u>Id</u>. (emphasis added); See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011); United States v. Massenburg, 654 F.3d 480 (4th Cir. 2011).

Courts assess reasonable suspicion by examining the totality of the circumstances in order to determine whether officers had a "particularized and objective basis for suspecting the person stopped of criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); see also <u>Arvizu</u>, 534 U.S. at 273, 122 S.Ct. 744; <u>Sprinkle</u>, 106 F.3d at 618. The reasonable suspicion

14

inquiry is fact-intensive, but individual facts and observations cannot be evaluated in isolation from each other. See <u>Arvizu</u>, 534 U.S. at 274-75, 122 S.Ct. 744 (finding that, even if the individual facts of a case may be susceptible to innocent explanation, they may be considered collectively to warrant a Terry stop). Moreover, the Supreme Court has recognized that this inquiry "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " <u>Id</u>. at 273, 122 S.Ct. 744 (quoting <u>Cortez</u>, 449 U.S. at 418, 101 S.Ct. 690). In light of this emphasis on officer experience, this court has stressed the importance of giving " 'due weight' to the factual inferences drawn by police officers as they investigate crime." <u>McCoy</u>, 513 F.3d at 411 (internal citations omitted); see also <u>United States v. Perkins</u>, 363 F.3d 317, 323 (4th Cir.2004). Neither Officer Goffreda nor Officer Whittington ever testified their experience led them to believe any certain fact about Mr. Hopkins, his car or any evidence of reasonable suspicion, therefore, the totality of the circumstances does not favor a finding of reasonable suspicion under the case law.

However, the Court's ruling on the matter states a totality of the circumstances suggested the following: 1. "Officer Goffreda was responding to a reported burglary; 2. "he saw a vehicle with a somewhat unusual passenger configuration sitting in front of the parcel upon which the subject residence sat, with the engine running; 3. It seems

15

customary that the driver of a vehicle would provide his operator's license to a law enforcement officer seeking identification; 4. When asked why they were in the area Mr. Hopkins evasively responded that they "were girl watching" in what was a relatively secluded residential area of Charleston, at night, with no "girls" or anyone else in sight and; 5. When asked to exit the vehicle, Mr. Hopkins instead engaged it and fled." And yet, despite factors 1-4's alleged importance and factual accuracy, the Officers' testimony was neither had seen Mr. Hopkins and Mr. Morgan do anything suspicious or illegal and Officer Goffreda testified they were free to leave.

Nowhere in the testimony, or anywhere else, suggests the two men acted suspiciously or acted nervously up to driving away. See United States v. Salzano, 149 F.3d 1238 (10th Cir. 1998) and United States v. Caicedo, 85 F.3d 1184 (6th Cir. 1996) (signs of nervousness, beyond the norm, cannot be the basis of reasonable suspicion, "nervousness" in isolation or in the presence of officers, does not meet the requirement of reasonable and articulable suspicion to support a pat down). When asked, Mr. Hopkins provided an apparently valid identification. And, despite the fact Officer Goffreda stated the Defendant claimed they had been "girl watching," the Defendant denied making that statement and asserts it is ridiculous given the time of night and the time of year. It was obviously dark outside. (JA-96 /Suppression Hearing Transcript) In fact, Mr. Hopkins testified he had dropped off two girls, was

16

waiting for them and the only reason he left was police harassment. (JA-170-175, Suppression Hearing Testimony) Furthermore, the officer's testimony did not suggest either man was nervous or gave inconsistent statements. See United States v. Perkins, 348 F.3d 965 (11th Cir. 2003) (the driver's nervousness and differing, but not inconsistent statements between him and the passenger did not provide the requisite for reasonable suspicion to justify the continuation of the stop and subsequent search).

Police had no basis for escalating the initial encounter given the fact the possible on-going burglary was still uninvestigated and even less reason to ask the two black men to exit the vehicle because, according to their own testimony, the men had done nothing illegal or suspicious. No officer had even confirmed a burglary in progress at the residence or ever spoken to an occupant of the home. If the two men were not under arrest, and merely subject to a "brief encounter between police and citizens," See United States v. Weaver, 282 F.3d. 302 (4th Cir. 2000), as the Court's Order suggests, they were free to leave at any time. The Court's Order also inexplicably characterizes Mr. Hopkins' driving away as "fleeing." If Michael Hopkins wasn't under arrest, or the subject of a Terry stop, as the Court's Order reflects, how can driving away be defined as "fleeing?" The answer is: logically, it cannot.

17

Officer Whittington and Officer Goffreda's testimony taken together suggest Officer Whittington attempted an illegal seizure/arrest of Mr. Hopkins because he felt Mr. Hopkins disobeyed Officer Goffreda's order. According to Officer Goffreda, there was neither reasonable suspicion nor probable cause to detain Mr. Hopkins and Mr. Morgan and they were free to leave. There was no reasonable explanation for either officer asking them to turn off the car or for searching their car. At no time did police suggest they reasonably believed the men were armed or a threat to their safety. See United States v. Spinner, 475 F.3d 356 (D.C. Cir. 2007) (police did not have reasonable suspicion that they were dealing with an armed and dangerous individual, so as to authorize a search of his vehicle). Furthermore, there was no legally justifiable reason for Officer Whittington attempting to reach in the car and attempt to disable it if, as Officer Goffreda testified, Mr. Hopkins was free to leave. This also ignores the fact Mr. Hopkins acquiesced to Officer Goffreda's initial order to turn off his vehicle despite the fact he had no legal duty to do so.  Given those facts, Officer Whittington's actions amounted to an attempt to illegally seize Mr. Hopkins. The Court made precisely this point in Terry v. Ohio, 392 U.S. 1, 19, n. 16 (1968): [o]bviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred."

18

Clearly, just arriving within 45 seconds, knowing nothing more than a fellow officer asked an individual to turn off the vehicle and step out of the car, does not give Officer Whittington the requisite knowledge or authority to stop Mr. Hopkins from leaving, especially when Officer Goffreda clearly testified Mr. Hopkins was free to leave. Furthermore, Officer Whittington's attempt at stopping Mr. Hopkins transcended mere words to stop, as the Court used to justify the fact a seizure never occurred, and escalated to attempted force to conduct an illegal seizure or arrest. Mr. Hopkins, at that point, had every right to avoid the illegal seizure because, by Officer Goffreda's own admission, Mr. Hopkins was free to leave. See Bad Elk v. United States, 177 U.S. 529, 20 S.Ct. 729, 44 L.Ed. 874 (1900). But for Officer Whittington's attempted illegal seizure, the car chase never occurs and no search is ever conducted. There is no doubt Mr. Hopkins felt officers were trying to illegally detain him because not only did he testify to as much, no "reasonable person would feel otherwise" if an officer was forcibly trying to disable his vehicle when he had done nothing. Michigan v. Chesternut, 486 U.S. 567, 573 (1988).

In fact, every bit of evidence seized was a result of the escalation occurring when Officer Whittington attempted to illegally stop Mr. Hopkins driving away. Officers lacked initial reasonable suspicion, tried to physically stop Mr. Hopkins from leaving when he was free to leave and pursued him in a vehicle despite the fact he had

19

done nothing. All other action ensued as a result of the improper escalation. Therefore, all evidence seized from the vehicle should be suppressed. If the arrest, search, or interrogation is later held to be unlawful and thus requires the suppression of the direct evidence, the derivative evidence must also be suppressed in certain circumstances. Specifically, derivative evidence must be suppressed when, as Justice Frankfurter explained, it is the "fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Clearly, Officer Whittington's actions had no legal basis, constituted an attempt to illegally seize Mr. Hopkins and Mr. Hopkins actions were a result of attempting to avoid that illegal seizure.

Even the argument regarding a high speed chase is ridiculous given the facts. Officer Goffreda testified Mr. Hopkins was free to leave. Yet, he and other officer's engaged in a vehicle pursuit because he may not have had a license. Officer Goffreda testified he was at least five blocks behind Mr. Hopkins when he attempted to gauge Mr. Hopkin's speed on Seventh Avenue. This means, if Mr. Hopkins was travelling as fast as the officer says, the officer had less than 30 seconds to determine Mr. Hopkins speed, based on 60-70 m.p.h. over .8 of a mile, with no specialized training. It simply is not a credible finding by an untrained officer. See United States v. Sowards, 690 F.3d 583 (4th Cir., 2012)

20

**II.  THE SEARCH OF THE RENTAL CAR DRIVEN BY MR. HOPKINS WAS AN INVESTIGATORY SEARCH, NOT AN ADMINISTRATIVE SEARCH, AND EVEN IF IT WERE AN ADMINISTRATIVE SEARCH, THE CHARLESTON POLICE DEPARTMENT POLICY IS UNCONSTITUTIONAL AND THERE WAS NEITHER PROBABLE CAUSE NOR EXIGENT CIRCUMSTANCES TO JUSTIFY A WARRANTLESS SEARCH.**

## STANDARD OF REVIEW

"We review legal conclusions involved in the district court's suppression determination de novo but review factual findings underlying the legal conclusions subject to the clearly erroneous standard." United States v. Rusher, 966 F.2d 868, 873 (4th Cir.1992).

## DISCUSSION

Officer Kapelchuck's search of the vehicle was an investigative search, and not an administrative search, because he: had been there less than a minute when he announced he saw a gun holster and was going to search the vehicle (JA-153 /Suppression Hearing Testimony); did follow Charleston Police Department Policy regarding inventory searches but that policy is unconstitutional under West Virginia Law (JA-154/Suppression Hearing Testimony) and; admits both occupants of the car were at the scene in custody when he began the search. (JA-153-154 /Suppression

21

Hearing Testimony) See <u>U.S. v. Edwards</u>, 632 F.3d 633 (10th Cir. 2001)

An inventory search conducted as part of regular procedures, and for administrative rather than investigatory purposes, does not require a warrant. See <u>United States v. Haro–Salcedo</u>, 107 F.3d 769, 772–73 (10th Cir.1997). Officer Kapelchuck testified it was standard procedure to conduct an inventory search of the vehicle and its contents to protect wrecker drivers and police from liability and to protect the occupant's belongings. (JA-144-145/Suppression Hearing Testimony) To be justified as an inventory search, however, the search cannot be investigatory in nature but must instead be used only as a tool to record the defendant's belongings to protect the police from potential liability. See <u>South Dakota v. Opperman</u>, 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (upholding inventory search where "there is no suggestion whatever that this standard procedure ... was a pretext concealing an investigatory police motive"); Haro–Salcedo, 107 F.3d at 772–73 ("An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence....").

In this case, it is clear that the search of the rental vehicle was conducted for investigatory, rather than administrative, purposes. Officer Kapelchuck testified that he "was there less than a minute when he saw a gun holster and announced he was going to search" (JA-143/Suppression Hearing Testimony)  even though he was

22

allegedly only assigned to "conduct a crash investigation and complete a report for the crash." (JA-146/Suppression Hearing Testimony) He also admitted on cross-examination that he was "searching the car" even though he had only been assigned as crash investigation, and that assignment came within 4 minutes of the crash itself. In addition, the decision to tow the car was not made until after the search revealed incriminating evidence against Mr. Hopkins, which makes it exceedingly difficult to believe that this was an inventory search conducted to protect the police from liability after the decision was made to impound the car.

Officer Kapelchuck also conducted an illegal search because while he followed Charleston Police Department Policy regarding inventory searches, he failed to ask or allow either Mr. Hopkins or Mr. Morgan to make alternative arrangements for any belongings before he conducted the inventory of the vehicle as required by state law. See U.S. v. Proctor, 489 F.3d 1348 (D.C. 2007), failure to follow D.C. statute and police department standard procedure rendered the impoundment and inventory search unreasonable.

The Charleston Police Department inventory policy does not require the occupants be asked to make disposition of their property before an inventory search occurs but State law does. In fact, State v. Goff, 166 W.Va. 47, 272 S.E.2d (1980), the West Virginia Supreme Court standard for "constitutionally sustainable" inventory

23

searches requires: (1) an initial lawful impoundment; (2) the driver was not present at the time of the impoundment to make other arrangements for the safekeeping of his belongings; (3) the inventory was prompted by a number of valuables in plain view in the car and; (4) there was no suggestion the inventory search was a pretext for conducting an inventory search. See also <u>State v. York</u>, 203 W.Va. 103, 506 S.E.2d 358 (1998). Both Mr. Hopkins and Mr. Morgan were available to be asked about disposition of their belongings but Officer Kapelchuck did not ask them because of his zealous behavior in conducting the illegal search. Furthermore, neither man abandoned his property willingly, Rather, they were trying to escape the illegal arrest when they ran.

Officer Kapelchuck could legally impound the car because it was wrecked and incapable of being driven but, he failed to meet the standard on all three other prongs. The driver was present at the scene by the officer's own admission (JA-153-154, Suppression Hearing Testimony).  The officer only saw an alleged holster in the vehicle not a number of valuables, though that holster was never listed on any documentation in this case. And, the officer admits he had only been at the scene about a minute when he allegedly saw the holster and announced he was searching the vehicle. It was never determined why a crash investigation of the vehicle would require an inventory search before the officer even detailed the crash scene and took

24

pictures of the vehicle when the driver and passenger were in custody at scene and posed no threat or exigency. See <u>United States v. Lugo</u>, 978 F.2d 631 (10th Cir. 1992), search of a defendant's vehicle after he had been arrested and had been removed from the scene was not "contemporaneous" with the arrest and thus not justified as incident to the arrest.  "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." <u>Arizona v. Gant</u>, 129 S. Ct. 1710 – 2009 So, while Officer Kapelchuck did follow Charleston Police Department Policy, that policy was unconstitutional under the State law authorizing it, and it is therefore invalid and unconstitutional in the case at bar.

## <u>CONCLUSION AND RELIEF SOUGHT</u>

WHEREFORE, the Appellant respectfully requests the Court to reverse the lower court's suppression ruling, overturn his conviction, remand this matter for trial and for any other relief this Court may deem just and equitable.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Oral argument is sought because the lower court's failure to suppress the illegally

obtained evidence and collaterally estopped evidence directly led to the Appellant's

guilty plea and all require further explanation.

Respectfully Submitted,

By: <u>/s/ A. Courtenay Craig</u>

A. Courtenay Craig
Craig Law Office
West Virginia State Bar No. 8530
621 6th Avenue
Huntington, WV 25701
T: (304) 697-4422
F:  (304) 250-3000
courtenaycraig@hotmail.com

*Counsel for Appellant*

26

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

No. 13-4434          **Caption:** US v. Stephen Hopkins

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the  type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

☑    this brief contains _____5,632_____ [*state the number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains _____ [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

☑    this brief has been prepared in a proportionally spaced typeface using
MS Word 2010 _____ [*state name and version of word processing program*] in
Times New Roman, 14 point _____ [*state font size and name of the type style*]; *or*

☐    this brief has been prepared in a monospaced typeface using
_____ [*state name and version of word processing program*]
with _____ [*state number of characters per inch and name of type style*].

(s) A. Courtenay Craig _____

Attorney for Appellant _____

Dated: 11/27/2013 _____

Rev. 03/03/11

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

MONICA D. COLEMAN
OFFICE OF THE U.S. ATTORNEY
300 Virginia Street, East
Suite 4000
Charleston, WV 25326
(304) 345-2200

*/s/ Catherine B. Simpson*
Counsel Press LLC
1011 East Main Street
Suite LL-50
Richmond, Virginia 23219
(804) 648-3664

Filing and service were performed by direction of counsel